And the court will proceed to the next case, Walker v. Ingersoll Cutting Tool Company. Mr. Hernandez. Good morning, counsel, members of the court. My name is Rene Hernandez. I represent Plaintiff Anthony Walker and the case that's pending before the court. As an initial matter at this juncture, Judge, I'd like to indicate to the court that the plaintiff will be withdrawing the federal claims and ask this court to solely look at the state law retaliation claim as the focus of our appeal here today. Anthony Walker was hired by the defendant, Ingersoll Cutting Tool, as a CNC machinist in 2008. He worked approximately six years and during that entire tenure never was formally disciplined or formally written up at any time for any discipline infraction. Anthony Walker did his job on a day-to-day basis. On October 14th or 21st, 2014, he was assaulted by a co-worker, Todd Rafferty. While he was at his machine listening to music, he was dancing, and Mr. Rafferty decided to assault him. By that, he threatened to beat him up. By that, I mean it was actually a threat of physical violence of imminent physical harm to Mr. Walker's person. That is a crime in the state of Illinois. The matter was actually observed by management, Andy Crook. Mr. Crook then separated the two that were having this interaction on the workplace floor. The parties were separated. Conversations were gathered. What's unique during this time is that Andy Crook, the manager, actually tells us, and part of the evidence in this case, is that he actually specifically heard Todd Rafferty threaten to punch the plaintiff in the mouth with physical violence, thereby supporting the plaintiff's claims of physical violence against him or the threat of physical violence against him. At this juncture, the parties are separated. Things go back to normal, so to speak. Then there's a subsequent day. My client shows up, and he's complaining that management has not taken the threat seriously, and he complains about the crime that has occurred to him in the workplace and management's failure to address his concerns. Management takes that as that this guy is a troublemaker, and ultimately they come to the conclusion after a couple meetings that Anthony Walker is the problem. And then they move, and then before I get there, before they move to terminate him, he's actually off work for several weeks from that time period to approximately, I believe it was November 17th when he was formally terminated. In between or before that date, Anthony Walker actually filed a police report. But one of the things I wanted to make sure the court understood is that nowhere in the public policy retaliation law is there a requirement that the reporting of a crime must be coupled with an immediate police report to the police department. That happened, though. Mr. Walker did in fact make that police report, and then subsequently on November 17th, he's terminated. This was just an exchange of words, is that right? Between Rafferty and my client? Yes. Rafferty actually threatened him in exchange of words. There was no physical, well, let me take that back. In my client's affidavit, he said that Rafferty bumped him, so there actually was physical contact, and also that was coupled with threats of physical violence. So my client then brings this claim. He brought some Title VII claims, which were summarily dismissed in summary judgment. We're no longer disputing those. Those, I thought, were the principal subject of your brief. That was the first part of the brief, and actually there was two parts and component of the brief. The second component focused solely on the public policy retaliation claim. In the section B of our complaint, or our brief, we brought these public policy claims, and it is our position that once the district court found a lack of federal cases, or when the federal issues no longer prevailed, that the court should have relinquished jurisdiction pursuant to 28 U.S.C. 1367 C.3. In my brief, I cite cases which support that proposition for final adjudication on the state law claim. Now, the way the court handled the state law claim is in our position, based on my reading of the court's order, both orders, is that the court treated it more like a federal claim and utilized the federal summary judgment standard versus the state law standard, which was appropriate here. And there is a distinction in federal courts. Its standard is a little more conservative, and the state is more lenient in its application of the summary judgment standard. As the court acknowledges in its July 11th order, the district court acknowledges in its July 11th order, indicating that there is a variance between the two. And would you agree that, since you were in a United States district court, Rule 56 of the Federal Rules of Civil Procedure was what governed it? It is my belief that when you're applying the summary judgment standard to a state law case I understand that's your belief. I find it difficult to reconcile that with Erie Railroad. But maybe you could enlighten me. Well, we believe that the court, based on my reading here and the cases that I've cited, that the court is in Which cases did you have in mind? Well, when I looked at the issues of, let's see, for example, in Collins, and the Turner case starts us off I'm asking you about the Federal Rules of Civil Procedure and the summary judgment standard, and what governs in the United States district court. Well, the district court certainly believed that 56 was appropriate, and it appears that this court believes that that was the appropriate manner. I'm asking you to tell me why it's not. Why you believe differently. Because we're dealing with a state law claim solely. No longer was the federal jurisdiction involved here. So, with that in mind, I'm only dealing with a public policy issue here. And what we believe is that the court improperly dealt with that case in that in the order of summary judgment it found that the defendant could not have reached the decision it reached because he filed the police report. But that's not the condition precedent that has to happen. My client just had to report a crime, which then invokes the public policy narrow exception that's provided in state law cases. Whether you take the Palmatier case, which is the case in which there was actual criminal activity or involvement in criminal activity and that individual was terminated, that was invoked and established that this narrow exception exists. And in this case, my client met all of those requirements. He engaged in a protected activity, reported a crime. Was there a causal nexus in the activity? We believe that the summary judgment standard, if applied appropriately, demonstrates it was. Because nothing was pending against my client except that he reported this activity and then all of a sudden he's no longer capable of being a member of this organization and he's out the door. Everything flowed from this report of the crime in the workplace. Everything. So, the issues that were raised by the defendant regarding another employee or other employees in which they had some issues, there's zero evidence to support that he was ever disciplined for it. There was any written documentation to support any of that. We know that there was issues regarding the machines that were going on in the workplace, but none of them rose to the level of concern by the employer to actually write up my client or cause any discipline to be issued against him. Now... Mr. Hernandez, wasn't the decision to report it to the police two days after he was terminated? It was several days later, Judge. It was several days later. And I think I put it in the Statement of Facts, off the top of my head, on October 29th. So, approximately eight days later, seven days later, he reported it to the police. They didn't take any action on it. So, how do we connect that action with the decision to terminate? It was the original reporting of the crime in the workplace to the employer, which is what I believe is the starting point. That is the protected activity. If I report a crime to you saying, this happened to me in your workplace, that triggers the public policy retaliation exception. And then everything that flowed thereafter was all causally related, at least from our position, to that initial reporting. There was nothing pending between my client and the defendant. So, ultimately, the decision to get rid of him was all premised on my client's complaints to them that they weren't protecting him in the workplace. His fear in his workplace, his fear in the workplace, because of the physical threats that were issued against him by Mr. Rafferty, and the defendant's failure to address it. They pretty much sloughed them off and said, well, deal with it. Not exactly those words, but the ultimate effect was to say, deal with it. And that's what happened here. So, when you apply the standard as set forth from the Illinois Supreme Court in the Michael case, the district court was wrong in the way it dealt with this case. While it's true when I did my motion to alter or amend the judgment, maybe the standard, as the court outlined it, is the wholesale disregard, misapplication, or failure to recognize the controlling precedent, as it states in its judgment order. The bottom line is that in that order, it recognizes the Michael case, but it just applied the standard at the federal level, knocking out the plaintiff's state law claims, as if it was a federal claim, not applying Illinois state law, which we believe is the appropriate manner. And one of the reasons why the court should have avoided creating precedent for this type of state law claim. So, with that in mind, Judge, we're asking the court to reverse that decision, to kick this matter back to the state court for final adjudication before the trier of fact. Thank you. Thank you, Mr. Hernandez. Mr. O'Connell. Thank you. Counsel, may it please the court. I am Bob O'Connell, representing the Congress on this matter. I appreciate Mr. Walker's counsel's elimination of the Title VII issue. That certainly simplifies what we have to do today. I'd like to suggest that they consider doing something identical with regard to the workers' comp retaliation issue, which in essence is no different. He was a minority. He suffered a discharge, but there's no causal connection. He had pending workers' comp claims. He was discharged, and there's no evidence of causal connection. That's the way the district court found it. And there's really not been any argument pursuing count three, the workers' comp retaliation. So I'm going to focus on what today's argument is focusing on, and that is the district court's decision to retain jurisdiction over the whistleblower claim. I think, first off, in citing Michael, the district court really cited it to support the proposition that in Illinois, Illinois law says we're employed at will. Yes, there are exceptions, and it goes on to talk about how those are nearly true, but that's the only use of Michael in this case. With regard to whether the district court should have sent it back, it's a unique situation where we are really being asked to undo what Mr. Walker sought to do when he invoked federal jurisdiction. He was there at his choice. He didn't have to be there at his choice, especially given the flimsy nature of both the Title VII and the workers' comp retaliation case. If this was his issue, he could have focused in the forum where he wanted to focus, where he today wants to focus, but he didn't. He's here. And being in federal court, we don't play by, I don't mean this disrespectfully, Mr. Walker's rules of procedure or Bob O'Connell's rules of procedure, but by the federal rules of procedure, there was plenty of discovery, there was no problem raised about an untimely motion for summary judgment. Ingersoll did its best to explain why they discharged Mr. Walker. It's unfortunate that he was discharged. Nobody wants to be discharged. But the other side of the coin is they had a series of unfortunate problems with Mr. Walker. The trigger to the discharge, the last trigger, the straw that broke the camel's back, one might say, was on October 23 when Mr. Walker tells not just his immediate supervisor, Andy Kruk, but Mr. Kruk, and then repeats it to the business unit manager, Dan Thompson, I don't trust you any longer. I've lost respect for you. I think he also said, and you've got a lot to lose. All that's in the record. The record is pretty clear in this case. We have contemporaneous documents. These were emails that were generated step by step as the decision-making process went through. What really happened is before this October 21 kerfuffle with Mr. Rafferty, the white employee, which, whatever it was, happened on October 21, as counsel points out, was broken up by Andy Kruk, the immediate supervisor, and nothing ever happened between the two of them again. They worked together the next day with no problem, October 22. The company sent Mr. Rafferty home that night. Both, it's in the record, both employees were counseled on October 22. And on October 23, the problems with Mr. Walker grew. These problems did not really begin just with Rafferty. As we've argued in our case, he had a two-year period of time where Mr. Walker was alleging that a co-worker was sabotaging the machine that he had to work on and that the company should discipline that co-worker for doing that, that he should give him days off, that he should be punished in a disciplinary sense. The company never agreed with that. Finally, after a long, I think, 18 months of this, Dan Thompson sat down with both of those two employees, Sterling Washington and Anthony Walker, separately, told them they got to put their dispute to rest, no more harsh allegations. It was Mr. Walker's deposition testimony that he understood after that meeting that he was being told to keep his mouth shut about Sterling Washington and let Sterling do whatever he wanted. That's his language, not mine. I'm not trying to be sarcastic about the man. His view was it had to be put to rest, I think. He didn't like that. He talked to Scott Tilton, the man that reports to the president of the company who oversees all of the operations in the Rutgers facility, about this. He sought a different result than he had acquired when he met with Mr. Thompson on November 26th. He didn't get it. There are e-mails dated January 2 that are in the record. I'll give you the record references. If you want them, I can find them. It would take a minute or two. Where this expectation is clearly set out, it's also set out in Mr. Tilton's affidavit, as is the fact that he's no longer working for the company. He doesn't have an axe to grind. There's no factual dispute about what I am representing to be the background to October of 2014. This altercation or this argument with Mr. Rafferty occurred on October 21, but between October 10 and October 16, Mr. Walker resurrected his angst towards Mr. Washington and two other employees, Mr. Vo and also Mr. Rafferty. Against that background, they have the problem. And it's unfortunate, but Mr. Thompson reached the conclusion he could not keep Mr. Walker in that what they call pod, that's their plant, unless he terminated these other employees. He decided, under those circumstances, to discharge him. He met on October 27th. Well, he e-mailed those facts to everybody involved, Mr. Tilton, and the Human Resources Organization. He met with Mr. Tilton on October 27th. They reached the decision to terminate him. HR opined on it on October 28th. The police report didn't come about until October 29th. The decision was made to discharge this guy before the decision was made to invoke the police. If there was a crime at any point in here, it sure seems to me that that crime is not tied to this discharge as illustrated by the e-mail changes that went back and forth. The notion that there was a threat, which I think we started off with the argument, that's in paragraph 28 of, I believe, Mr. Walker's affidavit. But the notion that there was a threat, we think, is I just misspoke. I apologize. If you look at document 52-2, page number 947, you'll see paragraph 28 of Andy Crook's affidavit where he says that after the Rafferty argument occurred, he brought him to their office, they separated him, they talked to Anthony Walker first, sent him back to work, and then he explains that Todd Rafferty came back to talk to him and what he actually said was, I wish I could go out there right now and punch the guy in the nose or the face or something like that. That was a threat that was made to Mr. Crook after the argument that they had. Now, I stress that because I think this was just words between these two. Yes, there is a belated insertion for purposes of summary judgment. We'll assume that they were bumped, that he was bumped. But it was essentially a workplace argument and nothing else. Now, the police report came about on the afternoon of October 29. This is not like Palmatier where the employer told the employee not to go to the police. He went to the police and got fired. The reason that I'm stressing that is we cooperated. There's no public policy problem here. Ingersoll cooperated with the police. They came out to the plant that afternoon. They investigated, and there's been no problem ever since. There was no prosecution of a crime. We're here really because the question is what was the employer's motive when they fired the guy. State law still requires some evidence of some motive that is related to the protected activity. I don't think any was produced. I don't think the district court found that any of that type of causal connection was shown, that there was any evidence of that sort. So we think that that concern alleging a whistleblower cause to this discharge is just misplaced. The key here was Mr. Walker failed to do what even Scott Tilton expected of him, and that is give up these harsh allegations, have respectful communication with people. It grew to a point where it was no longer going to be condoned. That was a business decision they made, and they let him go. If you have any questions, I'd be more than happy to help. Otherwise, I give back my time. Thank you, Mr. Olcott.  Mr. Hernandez. Thank you, Judge. Well, again, it supports our proposition, the argument he just made. The bringing up of Sterling Washington has nothing to do with what happened with the co-worker Todd Rafferty. They're separate incidents, and words are sufficient to commit a crime. To commit an assault is to only have to bring about imminent fear of bodily harm, and those are solely words, right? I'm going to beat the living you-know-what out of you, and if you perceive it to be that, that's a crime, right? Solely words. The employer just believes, okay, just two co-workers, no big deal. See, that supports our proposition. The employer clearly doesn't believe words mean anything in this context, but they do. It invokes the public policy narrow exception, and the reason anything happened to my client was because of that incident. Not Sterling Washington, not Tybo, not anybody else. He reports this incident on the 21st, and then shortly thereafter, they have meetings, and the whole meetings are geared, well, let's talk about getting rid of Anthony, right? But all of it flows from the conduct of reporting the criminal activity to the management of that company, all of it, all right? But for that incident, he would not have been terminated, all right? There's nothing in the record to show that he would have been terminated, but for this incident, when he calls this out, and then he calls on management to protect him, they send him home with pay, and he never comes back, all right? The way they deal with it is, like, well, he's the problem, right? But because he reported the crime, he received the protection under Illinois state law, public policy retaliation. That is why we're asking this court to reverse the decision on the state law claim and to send this back to the state court. Thank you so much. All right, thank you, Mr. Analyst. Thank you, Mr. McConnell. Case is taken under advisement.